UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

V.                                                       CRIMINAL NO. 3:19-CR-18-DPJ-LGI

TIMOTHY GRIFFIN

FINDINGS OF FACT

Timothy Griffin seeks relief under 28 U.S.C. § 2255. His case is before the Court on remand from the Fifth Circuit for an evidentiary hearing to determine the advice Griffin received from his attorneys before entering a guilty plea.

I.    Facts and Prior Proceedings

After Griffin pleaded guilty to possession of methamphetamine with intent to distribute, he unsuccessfully appealed his 262-month sentence. *United States v. Griffin*, 839 F. App'x 939, 940 (5th Cir. 2021). Griffin then moved under § 2255 to vacate his sentence [233], alleging ineffective assistance of two attorneys who represented him at different times through sentencing. Griffin was first represented by Tom Stingley, whom he replaced with T. Murray Whalen. Whalen later withdrew because of a conflict with Griffin, and Stingley was reappointed. Order [266] at 1–2. The Court ordered Stingley and Whalen to file affidavits responding to Griffin's § 2255 motion, and, after briefing, the Court denied his motion. Order [266].

In that Order, the Court concluded that even if Griffin received the advice from counsel that he claimed, there would be no prejudice given his sworn statements during hearings before the magistrate judge and the district judge. *Id*. Griffin appealed, and the court of appeals remanded the case for an evidentiary hearing on only two grounds Griffin raised in his motion:

> We grant a limited REMAND for an evidentiary hearing to determine the advice counsel gave Griffin concerning the possible sentences that might result from a trial versus a plea agreement and the relative likelihood of each such outcome. The district court should make findings on the evidence, and the case will then return to this panel.
>
> We retain jurisdiction of the appeal.

*United States v. Griffin*, No. 22-60453, 2024 WL 3174503, at *4 (5th Cir. June 25, 2024) (unpub.).

After remand, the Court requested Griffin's return to the district and appointed him counsel. When the evidentiary hearing began on September 6, 2024, counsel for the Government and Griffin both agreed that the remand instructions to "make findings on the evidence" limited the Court to fact findings on the advice Griffin received. *Id*. This Order summarizes the key testimony and makes those findings.

II.    Testimony at the Hearing

The Court first heard Griffin's testimony, and he rested his case after stepping down. The Government's witnesses were Griffin's former attorneys, Stingley and Whalen.

A.    Griffin Testimony

Griffin testified that Stingley was initially appointed as his counsel. During those first meetings, Stingley never discussed Griffin's criminal history but did ask about pleading guilty. Griffin didn't want that, so he replaced Stingley with Whalen. Around April 2019, Whalen told Griffin the Government offered a plea deal for 78 months' incarceration; he claims to have seen a piece of paper in her hand with "78 months" written on it. Griffin then says he wrote his fiancée about the plea-deal offer in May 2019. Griffin discussed it with the fiancée but rejected that

2

offer, preferring trial.  He later changed his mind when Whalen told him he *would* (not "could") get a life sentence if convicted at trial.[1]

Though he maintains that Whalen told him he would receive a life sentence if convicted, his testimony during the evidentiary hearing was somewhat inconsistent.  At first, he testified that she said, "[Y]ou can get a life sentence."  He then said she told him, "[I]f we go to trial, you can get a life—you are going to get a life sentence."  When the Court pressed him for clarity, he said she told him he "would get a life sentence."

Whalen later moved to withdraw after hearing recorded jailhouse calls in which Griffin complained about her performance.  A hearing was then held before Magistrate Judge Linda Anderson on the motion to withdraw, during which Griffin first expressed his desire to change his plea.  Judge Anderson explained the possible penalties if he accepted the guilty plea, which, according to Griffin, was the first time he understood them.  Whalen was excused, and Stingley was reappointed to handle the guilty plea.

According to Griffin, Stingley never discussed his criminal history with him before the change-of-plea hearing.  Stingley nevertheless advised that the likely guideline-sentence range would be 108 to 135 months and assured Griffin that the sentence would be no more than the mandatory minimum ten years.  Memo. [234] at 25.

As to that assurance, Griffin's testimony at the evidentiary hearing was less clear than his § 2255 memorandum.  The first time the subject was raised, Griffin testified that Stingley told him he never had a client receive more than ten years for charges like this, but Griffin testified that the conversation occurred while discussing the PSR—i.e., after he pleaded guilty.  Griffin also testified that Stingley "told [him he] wouldn't get no more than 10 years."  But he again

---

[1] The fiancée did not testify at the evidentiary hearing.

seemed to link that conversation to the meeting when he reviewed the PSR. During cross-examination, Griffin said Stingley told him before the plea hearing that the sentence "*starts* at ten years"—which would have been correct under the mandatory minimum—and that he based his decision to enter a guilty plea on that statement. He then said, however, that Stingley said before the plea hearing that the sentence would be ten years, "no more no less," though he again seemed to link that comment to the one about past clients which he said was made after he changed his plea. In any event, Griffin claims that Stingley led him to believe the sentence would be ten years. And he alleges that Stingley waited until after the change-of-plea hearing to discuss his criminal history or tell Griffin that he might face a career-offender enhancement based on his criminal history.

Griffin also testified that he was getting information about his case from other sources, including things he read and conversations he had with consultants.

B.   Whalen Testimony

Whalen testified that at her first meeting with Griffin he was "adamant about going to trial." She denied having said anything about a 78-month plea deal or having a document that reflected one. The only plea offer she conveyed arrived on May 22, 2019—about the time he thought the 78-month offer arrived—but it was essentially the same offer Griffin later accepted. *See* Whalen Aff. [243] ¶ 13 n.ii. Griffin rejected the plea offer because he still wanted a trial. He did, however, sign a written acknowledgment stating that he received the May 22, 2019 plea offer and reviewed it with Whalen. Plea Ltr. [243-7] at 1.

Because Whalen and Griffin remained in trial mode, she neither discussed the details of a guilty plea nor advised him about a likely range under the Guidelines. Instead, she told him about the statutory penalties, with their mandatory minimum and the prospect of life

4

imprisonment. She adamantly denied telling Griffin he *would* receive that sentence. She also testified that they discussed the "plus and minus" of going to trial and that she always told clients there is a 50-50 chance of a guilty verdict. Finally, she confirmed that if convicted after trial "you are going to look at a sentence that you could be exposed to life in prison."

B.   Stingley Testimony

Stingley testified that when he first met with Griffin, he had learned of Griffin's prior convictions, which he took to be one reason why Griffin was denied bond. In their first meeting after the initial appearance, he explained the Sentencing Guidelines to Griffin. Stingley said he wanted Griffin to understand that his offense level was around 32 to 34, putting his likely sentence near 20 years. Stingley also warned Griffin that his two priors could cause him to qualify as a career offender at sentencing, raising his offense level to around 37 or 38. Likewise, after resuming Griffin's representation for the change of plea and sentencing, Stingley told him his likely range was from 20 to 22 years and that the minimum sentence was ten years.

According to Stingley, Griffin disbelieved that advice and repeatedly insisted that he would get no more than ten years. Stingley denied telling Griffin that his other clients would have gotten under ten years, which he said did not "even amount to common sense" given the mandatory minimum was ten years. But he said that Griffin "had it affixed in his mind" that he faced only a ten-year sentence. This fixation persisted even when Stingley showed him the Guidelines sentencing table and went over the plea documents with him "paragraph by paragraph," including "the potential danger he was in for . . . the career offender guideline." Stingley testified: "I attempted to tell him, no, you can't rely on [ten years]. That's the minimum." According to Stingley, he told Griffin that pleading guilty with a career-offender

5

finding would have him "looking at 22 years."  He also told Griffin that if he went to trial he might be facing a life sentence because his guideline range as a career offender would be so high.

III.     The Court's Findings

Having heard the testimony and observed the witnesses, the Court fully credits Stingley and Whalen and must reject Griffin's account.  While Griffin may believe what he said, his sworn testimony in other hearings and his submissions to the Court make him an unreliable witness:

- He says in his § 2255 Memorandum that he "paid Attorney Whalen tens of thousands of dollars."  Mem. [234] at 12.  She disputed that, and he acknowledged during the evidentiary hearing that it was only $7,500.

- He alleged in his Memorandum that Stingley failed to seek a variance during the sentencing hearing, but Stingley made that argument.  Sentencing Hearing Tr. [209] at 37.

- He told Judge Anderson—under oath—that he was never given a plea offer by the Government.  Withdrawal Hearing Tr. [242] at 8–9.  Yet he signed a letter acknowledging the Government's earlier plea offer.  Plea Ltr. [243-7] at 1.

- He testified during the evidentiary hearing that he didn't understand the possible term of incarceration during the plea hearing or that he "could get more than ten years."  But he also testified at the evidentiary hearing that he understood the potential sentence once Judge Anderson explained it to him.  And, of course, he unequivocally confirmed that understanding under oath at the plea hearing itself.

- He testified during the evidentiary hearing that he did not "fully understand" the questions he was asked during the plea hearing.  Yet the Court told him at the plea hearing, "[I]f you're just not sure what I'm asking, I want you to let me know, and I'll be happy to repeat or restate the question."  Plea Hearing Tr. [224] at 4.  Griffin agreed and then confirmed over and over that he fully understood the issues.

- He testified at the evidentiary hearing that he could not "say [he] knew exactly what [he] was pleading guilty to in the full thing because I didn't understand it."  Yet Judge Anderson went through the plea deal in open court during the withdrawal hearing, and he indicated his understanding and desire to plead guilty.  Withdrawal Hearing Tr. [242] at 19–20.  Griffin then signed a plea agreement stating that he read the agreement, discussed it with his attorney, and understood it.  Plea Agreement [182] at 6.  Griffin also stated under oath during the plea

6

      hearing that he discussed the charges with Stingley and that he fully understood them.  Plea Hearing Tr. [224] at 6.  Stingley confirmed it.  *Id.* at 7.

- He similarly downplayed his understanding of the PSR and his conversations with Stingley about it though he confirmed at the sentencing hearing that he "fully underst[ood] what [was] reported."  Sentencing Hearing Tr. [245-2] at 5–6.

Again, Griffin may believe what he said during the evidentiary hearing, and some of this may result from nerves or his admitted lack of understanding about the law.  But these misstatements affect his credibility when weighed against the credibility of his attorneys.  Moreover, much of what Griffin said was simply inconsistent with the law.  By contrast, the attorneys gave plausible testimony that was legally sound and demonstrated their extensive knowledge.  With that in mind, the Court turns to the findings.

    A.    Whalen's Advice

According to Griffin, Whalen affected his decision-making by suggesting a deal for 78 months and by predicting he *would* receive a life sentence if he went to trial and lost.

        1.      Whether Whalen Conveyed a 78-Month Plea Agreement

As noted before, Griffin testified that he thinks the Government offered a 78-month deal in "April or somewhere like that."  A deal was offered in May, but not for 78 months as no such offer was ever made.  In June, Griffin signed the guilty-plea offer letter from the Government acknowledging that he had received and reviewed it with Whalen.  Plea Ltr. [243-7] at 1.  That letter supports Whalen's testimony and contradicts Griffin's testimony denying that he ever discussed a plea with Whalen other than the 78-month deal.

Griffin's claim also conflicts with his sworn testimony at the withdrawal hearing before Judge Anderson:

    THE DEFENDANT:  . . . I'm trying to get a plea bargain and get out the way.
    THE COURT:  Have you not been offered any kind of plea—

7

THE DEFENDANT: No, ma'am.

Of course that testimony was untrue; Whalen presented the May 2019 plea offer Griffin acknowledged in writing. Plea Ltr. [243-7]. Still, the testimony contradicts his current position that he received a 78-month plea offer.

Likewise, at the plea hearing, right after the Government summarized the plea agreement and stated that this was "the best offer that was made," the Court asked Griffin whether he heard and agreed with what the Government had said. He stated under oath, "Yes, sir, Your Honor." Plea Tr. [224] at 10–11. So, his claim about an earlier 78-month plea offer is directly contradicted by his sworn testimony at the plea hearing. The Court finds that Whalen did not present a 78-month plea offer.[2]

    2.  Whether Whalen Said Griffin "Would" Receive a Life Sentence Post-Trial

Griffin testified that Whalen told him he "would" receive a life sentence if he lost at trial. But as noted, his testimony was sometimes equivocal; he twice said she told him, "[Y]ou can get a life sentence." And that's what Whalen said she told him. The Court fully credits her testimony.

Perhaps Griffin heard something different from someone else—he admits receiving advice from others. Or maybe he just didn't comprehend what Whalen said. Either way, the Court believes Whalen's testimony that she never said he *would* be sentenced to life. Whalen knows this area of the law, and she was correct that he *could* be sentenced to life under the statute and the Guidelines. Her testimony also fits what Griffin acknowledged that he

---

[2] Though beyond the remand scope, the Court notes that Griffin's testimony at the evidentiary hearing confirms that he knew, after Judge Anderson explained the plea offer, that there was no 78-month deal on the table. That knowledge was further confirmed by the text of the plea agreement he acknowledged in writing, his conversations with Stingley, and the guilty-plea colloquy at the plea hearing.

8


understood during the withdrawal hearing before Judge Anderson, at the plea hearing, and in the Plea Agreement.

As for her advice about the relative likelihood of a given sentence if Griffin pleaded versus went to trial, her testimony that they were in trial mode and not discussing guilty-plea options matches Griffin's evidentiary-hearing testimony. Accordingly, what was said was minimal, but the Court credits her testimony that she always tells her clients there is a 50-50 chance of a mistrial or acquittal but that she never discussed a specific sentence with him—other than what the statute states. In short, she gave him no "relative likelihood" advice about sentencing results from a guilty plea versus a verdict.

B.  Stingley's Advice

There are two points of contention. First, Griffin says Stingley never explained that he could face a career-offender enhancement. Second, he claims Stingley conveyed that the sentence would be no more than ten years. Stingley testified that neither statement is true, and the Court credits that testimony.

1.  Whether Stingley Discussed Career-Offender Status

Stingley's testimony about the Guidelines illustrates his depth of knowledge. He provided a detailed description of what he discussed with Griffin during their meetings, and what he said tracks the way the Guidelines work. The Court simply cannot credit Griffin's claim that Stingley never once mentioned his criminal history before receiving the PSR. The Court believes Stingley told Griffin at their first meeting, and upon reappointment, that based on his prior convictions he risked a career-offender enhancement and a Guidelines range in the upper 30s.

2.      Whether Stingley Said Griffin Would Receive No More than Ten Years

Perhaps someone told Griffin he would receive ten years, but the Court does not believe it came from Stingley.  First, as noted above, Griffin's evidentiary-hearing testimony was ambiguous about what Stingley said before the plea hearing.  At one point, he said Stingley told him the sentence "*starts* at ten years."  That seems more credible as it is legally accurate and matches Stingley's testimony.  Second, Stingley was unambiguous.  He clearly recalled that it was Griffin insisting that the sentence would be for ten years and that he could not shake him from that fixation.  Third, Stingley's testimony was detailed and consistent with the law.  Stingley testified that he told Griffin he was looking at a Guideline range in the upper 30s and a likely sentence of 20 to 22 years, which proved accurate.  The Court simply finds it implausible that an attorney with Stingley's experience and skill would never discuss his client's criminal history—as Griffin alleges—and then assure a statutory minimum sentence.  Finally, the Court found Stingley highly credible when he emphasized that he neither guaranteed a ten-year sentence nor referenced his past clients to assure Griffin that he would receive one.[3]

As to relative likelihood, the Court credits that Stingley never seriously discussed these issues with Griffin.  During the first representation, Stingley mentioned the possibility of pleading guilty, but Griffin wanted to go to trial, and Stingley was replaced.  When Griffin announced during the withdrawal hearing before Judge Anderson that he wanted to enter a plea, Withdrawal Hearing Tr. [242] at 20, Judge Anderson stated that she was appointing new counsel "to go over the guidelines with you and the plea agreement.  I'm not appointing a new attorney

---

[3] Even if Stingley did say his past clients never received more than ten years, it appears from Griffin's evidentiary-hearing testimony that the comment was made after the plea hearing, making it irrelevant.

10

for trial based on what you've represented to me," *id.* at 21.  Griffin agreed.  *Id.*  So when Stingley resumed his representation, it was after Griffin had already decided to plead guilty.  Relative likelihoods never arose.  That said, Stingley testified he told Griffin that yes, without a deduction for acceptance of responsibility, a life sentence would be at the top of the guidelines range—which was true.

IV.     Conclusion

Griffin testified during the evidentiary hearing that he did not understand much of what happened during his case, even topics the Court reviewed in painstaking detail during separate hearings.  Perhaps he similarly misunderstood what his attorneys told him.  Or maybe he was told those things by the other people giving him advice.  In short, he may believe what he said.  But even so, Stingley and Whalen were more credible and persuasive.

The Court finds that Griffin was not told he could plead guilty for a 78-month term.  He was not told that a life sentence was certain if he was convicted after trial.  He was made well aware that his crime carried a statutory minimum sentence of ten years.  He was not told it was likely that he would receive a ten-year sentence.  He was in fact apprised of the Guidelines range and likely sentencing level before his guilty plea, and he knew that his prior record, added to his offense, could result in a sentence exceeding 20 years.

**SO ORDERED AND ADJUDGED** this the 16th day of September, 2024.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE